Marcus G. Christ, J.
The plaintiff owns and operates a retail liquor store, sometimes called a package store, at 209 Bayview Avenue, Inwood, Nassau County, New York. The defendant is a labor union, an affiliate of the AFL-CIO known as the Wine & Liquor S'.ore Employees Union, Local 122. The union for some time prior to the institution of this suit was engaged in organizing the retail liquor stores on Long Island. The plaintiff has been in business for 12 years at this property and the business is substantial. The union has been and is picketing plaintiff’s store. This suit is for an injunction to stop the picketing and to stop other practices which it is claimed the defendants are engaged in to the damage of the plaintiff and also seeks a money judgment in the sum of $60,000. The picketing was stopped for a time by a stay in an order to show cause which brought on a motion for a temporary injunction. This application was heard before Mr. Justice Bitohib. He took three days of testimony and denied the temporary injunction. The contention of the defendants that the findings and determination by Judge Bitchie are now the law of the case and binding on the court, is rejected. Mr. Justice Bitchie had only presented to him a part of the evidence which is now offered and his consideration was limited to that of granting temporary relief pending the final decision. There has come before the court on this trial the full proofs of the case. The plaintiff has operated the store but he has not been much in attendance. His wife has been in charge. She has done the ordering and has kept the books and has been directly in control of the help. In addition to the wife, one employee has usually been on duty with her. One served in the early part of the day and another came on to relieve the first in the afternoon. One of these employees was Marty Sackler. He belonged to the union for some time prior to the picketing but he never disclosed this and when a union dues bill for him came to the store and he *48 was asked about it he disclaimed any membership in the union. This he did under instructions from his union superiors. Even though the picketing was in full swing, Sackler came to work each day and continued to conceal his membership in the union from the plaintiff. He passed back and forth through the picket lines and worked in the store. No other employee of the plaintiff in the liquor store ever joined the union. At first, the man Fred Skellington was employed and later the witness Francis Miller. While Skellington was there, Mrs. Benedetto wrote out a paper in her handwriting and submitted it to both Skellington and to Sackler. She requested their signature upon it. It was a proposed statement to the effect that they were satisfied with their employment, that they did not care to and would not join the union. Skellington signed but Sackler who was then a union member did not. The paper is not in evidence and there is no copy of it in existence. Mrs. Benedetto stated that she tore up the Skellington statement. Skellington did not figure at the trial. The store was held up by bandits and Skellington thereafter promptly resigned. Mrs. Benedetto made no threats to the employees in connection with the paper to the employees. She sought the signatures in the belief that if the employees signified their satisfaction with conditions the union would cease its picketing.
The first harbinger of labor trouble came on December 18, 1956 when the employer received in the mail a proposed contract with a request that it be signed and returned to the union. It bore the plaintiff’s trade name and outlined the employee-employer relationship which the union sought to have imposed. There was no call in relation to this paper or any other talk about it with the plaintiff or his wife, either before or after its receipt. The union states that the contract was sent in error, that contracts were never sent except to those with whom negotiations had been concluded but that this paper in the course of a mistake in its record-keeping was sent to Benedetto. There was evidence given to support this view, that it was not a solicitation, nor an act of pressure. When taken in the light of succeeding developments it becomes an important fact in the case.
Six months elapsed and then Mr. A1 Schultz, executive vice-president of the union called at the Benedetto’s store. Sackler introduced him to Mrs. Benedetto and he announced that he came to speak about relationships of the plaintiff with the union. Mrs. Benedetto took him aside out of Sackler’s hearing. He discussed the signing of the contract and wanted the plain *49 tiffs to join and explained the advantages of the union shop. Mrs. Benedetto said she would talk with her husband. Schultz gave her a card with his telephone number and his title. No one called him but he returned and at this time stated that if the Benetettos did not sign up they would have cause to regret it. They did not sign up and on September 24, 1957 between 10 and 12 o’clock in the morning pickets appeared and they carried a sign which read as follows: 1 ‘ The employees of this store are not Union. Please do not patronize this non-Union store. Help us maintain decent American standards and living conditions in the liquor trade. I am a member of the Wine & Liquor Store Employees Union, Local No. 122.” This sign was in part false because Sackler who was then an employee and working regularly in the store was in fact a union member. The pickets did not come en masse. Usually there was one picket before the store but at times two men walked up and down. Benedetto’s trade is largely from colored people in the vicinity and colored pickets appeared. By reason of the stay and the denial of a temporary injunction by Justice Ritchie, picketing was interrupted on October 15, 1957 and resumed again on November 6, 1957. During the ■ interruption Marty Sackler came into his true light and revealed his union membership. When the picketing was resumed he ceased to work at the store and became a zealous picket. Although he was picketing Benedetto he was simultaneously working for another nonunion store a few miles away. This work he carried on in his off-picket hours and at the time of the trial he was still so engaged.
While the stay was in effect a very important development in the determination of this suit took place. Mrs. Sackler who was socially friendly with Mrs. Benedetto, made arrangements for Mr. A1 Schultz to come to speak to the Benedettos at their home. There were two such conversations and at least in part there is a record of these conversations which was admitted in evidence and which sheds a light upon the purposes of the union in its picketing. The recording of these conversations contains an important colloquy between Schultz and Benedetto whose respective voices are unmistakable.
“Me. Schultz: Well, the only thing is this, Patsy. I can only suggest to you if you want the picket line off, there is only one way to get it off, you know that, I don’t have to tell you. You can sign with the union, do it with the Metropolitan if you want to. If at any time we sign a contract with the Nassau County Package Store Association, you have your American right to switch over. * * *
“Mb. Benedetto: Well, let me think it over, I take it up with Bergman.
*50 “ Mb. Schultz : I’ll tell you one thing, if you are going to speak to Bergman on this particular issue, you follow me, Bergman is going to let that thing of mine go, because as far as he is concerned, he may want to go to an appeal or something, to appeal the ease, which is perfectly all right with us, do whatever you want, but if you can get that picket line off, I can’t tell you this is an authorization for Metropolitan, if you want to know anything about the contract or anything about the union, I am here to tell you. If there are any questions on your mind that you want to know, I will tell you.
“ Mb. Benedetto : That is the contract you have there now?
“Mb. Schultz: This is just an authorization. This is a copy of the contract.
“Mb. Benedetto: That’s the contract?
“Me. Schultz: That is between, Articles of Agreement, Wine and Liquor Store Employees Union Local No. 122 and Metropolitan Package Store Association, Incorporated. This covers the package stores. Now I got on here “ For Information Purposes Only.” If you want to glance through this, I’ll sit here while you look through it, if you want to look through it now.
“ Mb. Benedetto : I wouldn’t do anything without Mr. Bergman.
“Me. Schultz: So why doesn’t Bergman call? Bergman doesn’t seem to be interested in you. Why doesn’t he call me? Why doesn’t he call my office? (Several words undistinguiskable by reason of low-flying plane.) He knows the Metropolitan is there. Because the more that picket line goes, it isn’t going to be easier, going to put more and more pressure to keep those people out. We don't want to fight but if we get that fight, it is not going to be the union, you follow me. I am here for one thing, Patsy. I am here for Marty, and actually I am here for you. You can save yourself a lot of aggravation and a lot of money.”
These conversations between Schultz and Benedetto were designed to persuade Benedetto to sign the contract with the union even though the union did not have a majority of the workers. Strangely enough, though the picketing is claimed to be for organizational purposes, no one ever directly asked Miller, the employee, to join the union. This union had a strange union practice although it claimed to be organizing the employees. It accepted as members, proprietors of liquor stores who themselves are not employed by anyone. The plaintiff and his wife it appears were acceptable both as employers contracting with the union and as members of the union as well. Such position seems anomalous.
Sackler received a raise in and about this 1st of July, 1957. He says that it was after Schultz appeared but the testimony of Mrs. Benedetto is that Sackler had been raised before and that it was about time that they raised him again. The books of account bear her out. In the normal course, he received this raise and received it prior to the time that Schultz came to speak to her.
*51 The Conduct of the Pickets.
The picketing was not mass picketing. It was usually conducted by one man alone, but during some part of the day there were others in attendance with him. The pickets spoke to the patrons of the store and urged them to go elsewhere and not to patronize the store. They said that the employees were on strike and stated that there was not anything in the store to buy. They addressed people on the sidewalk and people driving up in automobiles to park at the curb. And the pickets at some time told the customers that the store was closed. To offset this a sign “ Open ” was hung in the store. They talked to truck drivers and urged them not to cross the picket line to bring goods and merchandise into the store. They occasionally were in wordy altercations with Francis Miller, an employee, of the store. Some times the pickets stood in front of the store door but no one was stopped physically from entering. On at least one occasion the police were called but no arrests were made.
Effects of the Picketing.
Although there is an annoyance to the employer and to patrons, the picketing cannot be considered disorderly. People who were conscious of picket lines did not cross the line and did not enter the store. Customers who were approached were frequently turned away and went elsewhere. There is testimony by another dealer in the neighborhood that people who normally frequented the other store came into his store after the pickets were on, to do their purchasing. Deliveries were made difficult to get. The inventory of the store was affected and drivers coming with goods refused to cross the picket line and in other instances goods that were to be shipped out after the salesman had sent in the order never left the distributor’s place because the union there would not ship the goods. Deliveries were late and long in coming between the time of the order and the time when deliveries were able to be gotten through. Plaintiff is a member of the Long Island Liquor Dealers Association and this organization, through its president, endeavored to assist the plaintiff during his difficulties with the picketing. A newly organized warehouse licensed by the New York State Liquor Authority and located at 146 Post Avenue, Westbury, N. Y. was operated by one Herman Heuck. In order to facilitate the plaintiff’s deliveries without crossing *52 the picket line he instructed that his goods he shipped to this warehouse where he would pick them up and take them to his place of business. However, at about the time the warehouse opened, it too was picketed, although the signs appeared to have the picketing directed against the association rather than against any retail liquor store owner. When this picketing was on, the deliveries became still more difficult for plaintiff since truckmen would not cross this line. The pickets were withdrawn within a few weeks of their having been put on and now there are no pickets at the Westbury warehouse.
In order to tell the public the Benedettos’ side of the picketing, they put two signs in the window of their store which read: “ A message to our customers and friends, we are not unfair to our employees. They are not striking! We pay more than union wages and vacation with pay.”
The business of the plaintiff’s store was materially decreased and he suffered damages in a loss of business which are difficult to measure but which are, nevertheless, real and which he cannot recoup. Each day the strike continues his damage continues. The damage he suffers is irreparable and substantial. There were other effects upon the store which were not irreparable. Separately they were each small annoyances but when taken together they amounted to considerable disturbance and inconvenience. The window dresser has never come again. He would not cross the picket lines. The window cleaners were interrupted for approximately a month. The floors were not waxed for some time. The towel service was interrupted.
The Law Applied to the Facts.
The court is very closely circumscribed in granting injunctions in labor cases by section 876-a of the Civil Practice Act. If there is a labor dispute within the purview of this section no injunction may issue in this case. On the other hand, if the picketing is for an unlawful objective, then it ceases to be a labor dispute and an injunction will lie (Goodwins, Inc. v. Hagedorn, 303 N. Y. 300). The leading case of Wood v. O’Grady (307 N. Y. 532) involved the same union as is now before the court. The law of that case is a further declaration of what has long been the law in this State, that stranger picketing for organizational purposes is a lawful objective, and no injunction may lie against this. But when picketing by a union which does not represent a majority of the employees is done for the purpose of compelling the employer to recognize the union and to execute a contract with it, such picketing *53 is for an unlawful purpose and will be restrained, provided irreparable harm is being suffered by the employer. Some of the facts of this case parallel the facts in the O’Grady case but there are some elements present in this case not found there.
1. The union concealed that one of the employees, i.e. half of the labor force, was a member of the union. It made no disclosure of this but deliberately held it from the employer.
2. There was really only one other employee to be brought over into the union in order to secure the necessary majority.
3. The conversations here between the executive vice-president of the union and the employer definitely showed that the pressure was upon the employer to execute the contract and that if such contract were executed the pickets would be withdrawn.
4. There is in addition to the showing of inconvenience in deliveries and store management, the establishment of a definite loss of customers and income to the plaintiff. The income cannot be recouped. The opportunity to earn it passed away with each day of picketing. This is an irreparable damage.
In this case, the possible gains for the union, that is acquiring one new member and unionizing the shop with two employees are mild against the heavy and irreparable harm that befalls the employer. The pressure is not on the employee but on the owner. It is clearly economic pressure to bring the employer to terms.
The claim that the picketing is for organizational purposes is disclosed merely as a screen to mask the true objective, namely a direct, forceful and economic assault upon the employer of such persuasion that he would capitulate and sign the union contract.
The employer endeavored to bring the matter to a head initiating a proceeding before the State Labor Relations Board to have it adjudged whether the union was the bargaining agent for the employees and was lawfully bringing these pressures upon him to sign a contract. In that proceeding the union admitted it did not have the majority requisite to represent the employees and to carry on the negotiations, for the proceeding was terminated, not dismissed. This had the effect as stated in Matter of Fleetwood Acres (19 S. L. R. B. 110) of a finding that the union was not the bargaining agent of the employees. In these proceedings the union never denied that it had demanded a contract. It is argued by the plaintiff that such a demand was a condition precedent to the State Labor Relations Board taking jurisdiction and that since no contrary *54 finding was made, the board has found that there was such a demand. Though this may be true, the court does not rest its decision upon this contention.
There is an additional fact in this case which mitigates in favor of the union and against the injunction. It is the fact that Mrs. Benedetto presented to the employees a proposed statement that they were satisfied with ther wages, that they did not care to join the union and would not join it. This might be deemed an unfair labor practice. However, under the circumstances in which the matter was presented there was no duress, no pressure on her part and even after Marty Sackler declined to sign it and before he disclosed his membership in the union, there was no retaliation. He continued to work until of his own volition he ceased. The paper written in longhand by the wife of the proprietor was presented by her to the employees in the belief as she stated, that if these men once indicated their point of view and this were made known to the union, that would be the end. It was a mistake, it should not have been done but it is not fatal to plaintiff’s case. There were no effects of it in the union negotiations. The paper signed by Skellington was never used. It was ultimately destroyed. Skellington did not stay long in the employ of plaintiff and he never became the subject of any further solicitation by the union. So far as Sackler was concerned, no harm was done because he was already a member of the union. This cannot be considered such an unfair labor practice as would bar the plaintiff from the recovery which he seeks.
The court finds:
(a) That unlawful acts have been committed in the endeavor to compel the employer to sign with a non-representative union.
(b) The substantial and irreparable injury to complainant’s property will follow unless the relief requested by plaintiff is granted.
(c) That as to the relief granted, greater injury will be inflicted on the plaintiff by the denial thereof than will be inflicted on the defendants by the granting thereof.
(d) The plaintiff has no adequate remedy at law.
(e) The public officers charged with the duty to protect plaintiff’s property are unable to furnish adequate protection since the nature of the wrong and unlawful acts are not susceptible of regulation by the public officers until there has first been an adjudication by the court that the illegality exists.
(f) Nothing herein is intended to or shall be construed to order or authorize a violation of section 876-a (subd. 1, par. [f]) of the Civil Practice Act.
*55 Judgment is rendered for the plaintiff as demanded in the complaint, except as to paragraph C of the complaint. Although irreparable damage is shown it is not susceptible of proof with such definiteness as would entitle plaintiff to recover money damages. As to this item in the prayer for relief no money judgment will be given.
This constitutes the decision of the court pursuant to section 440 of the Civil Practice Act.
Submit judgment.